UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| INLAND BANK AND TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | 17 C 604 |
| | ) | |
| vs. | ) | Judge Gary Feinerman |
| | ) | |
| LL FLEX, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>Memorandum Opinion and Order</u>

Inland Bank and Trust ("IBT") brought this diversity suit to collect $709,146.58 in

allegedly unpaid invoices from Oracle Flexible Packaging, Inc. Doc. 102. After the court

denied its Rule 12(b)(2) motion to dismiss, Docs. 39-40 (reported at 2017 WL 3521166 (N.D. Ill.

Aug. 15, 2017)), Oracle answered and asserted a set-off affirmative defense, Doc. 104. The

court then denied IBT's Rule 12(c) motion for judgment on the defense. Docs. 69-70 (reported

at 2018 WL 1508488 (N.D. Ill. Mar. 27, 2018)). A corporate transaction resulted in the

substitution of LL Flex, LLC for Oracle as the party defendant. Doc. 82. With trial set for June

2020, Doc. 201, the parties cross-move for summary judgment, Docs. 144, 165.

## Background

With the parties cross-moving for summary judgment, the court ordinarily would view

the facts in the light most favorable to IBT when considering LL Flex's motion and in the light

most favorable to LL Flex when considering IBT's motion. *See First State Bank of Monticello v.

Ohio Cas. Ins. Co.*, 555 F.3d 564, 567 (7th Cir. 2009) ("[B]ecause the district court had cross-

motions for summary judgment before it, we construe all facts and inferences therefrom in favor

of the party against whom the motion under consideration is made.") (internal quotation marks

omitted). But because the court will grant in part IBT's motion and deny LL Flex's motion except as to a matter (issue preclusion) that rests on uncontested facts, the facts are set forth as favorably to LL Flex as the record and Local Rule 56.1 permit. *See Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 430 (7th Cir. 2014). At this juncture, the court must assume the truth of those facts, but does not vouch for them. *See Gates v. Bd. of Educ. of Chicago*, 916 F.3d 631, 633 (7th Cir. 2019).

### A. Oracle's Sale of Alpha Aluminum

Oracle operated an aluminum rolling mill and a flexible laminate plant in North Carolina. Doc. 190 at p. 4, ¶ 8. Oracle spun off the mill's assets into a new entity and offered it for sale. *Id*. at pp. 4-5, ¶ 9. That entity eventually became Alpha Aluminum, LLC. *Ibid*.

AluminumSource, LLC purchased Alpha from Oracle in August 2015. *Id*. at p. 5, ¶ 10. The sale was memorialized in the Membership Unit Purchase Agreement (the "MUPA"). *Id*. at pp. 5-6, ¶ 11. Based on a final calculation of Alpha's working capital—the accuracy of which the parties now dispute, *id*. at pp. 22-25, ¶¶ 39-41—Alpha's purchase price was increased by $1.25 million before closing, *id*. at pp. 5-6, ¶¶ 11-13. To ensure the sale would proceed, Metallic Conversion Corporation agreed to purchase $1.25 million of inventory from Oracle, and Alpha guaranteed Metallic's payment of the $1.25 million. *Id*. at p. 7, ¶ 14. Oracle delivered the inventory to Metallic in August 2015, and Metallic paid Oracle as promised. *Ibid*.

AluminumSource paid Oracle cash for most of Alpha's purchase price, and Alpha executed a $1 million promissory note in favor of Oracle (the "Oracle Note") for the rest. *Id*. at p. 7, ¶ 15. The Oracle Note required Alpha to make quarterly interest payments. *Ibid*.

Because Alpha needed time to establish itself, it entered into the Transition Services Agreement (the "TSA") with Oracle under which Oracle would provide specific services for certain periods. *Id*. at pp. 7-8, ¶¶ 16-17. Those transition services included the "full time

services of Jack White, Director of Sales – Metals, in a manner consistent with the normal duties, responsibilities and authority provided by such position." *Id*. at p. 8, ¶ 17. Oracle and Alpha also entered into a sublease ("Sublease") requiring Alpha to pay rent, taxes, utilities, maintenance, and janitorial costs to Oracle for use of the mill. *Id*. at p. 11, ¶¶ 21-22.

Because Alpha sought to develop a consistent source of third-party revenue, and because Oracle sought a continued, reliable source of aluminum, the two firms entered into the Product Supply Agreement (the "PSA"), under which Oracle agreed to purchase from Alpha certain quantities of aluminum. *Id*. at pp. 12-13, ¶¶ 24-26. Since BB&T, Alpha's lender, was not willing to lend to Alpha if too great a percentage of its accounts receivable was owed by any single buyer, the PSA provided that, if necessary, Alpha could assign Oracle's purchase orders to Metallic for Metallic to fulfill. *Id*. at pp. 13-14, ¶¶ 27-28. The PSA provided that Metallic would be a party to the PSA "for purposes of Section 2 only." *Id*. at pp. 15-16, ¶ 30; Doc. 168-25 at 1. Section 2 reads, in relevant part:

> Notwithstanding anything to the contrary herein, from time to time, [Alpha] may elect to assign, transfer, or delegate its obligations under any Purchase Order to Metallic. In the event of any such assignment, (i) such Products shall be manufactured by and sourced only from [Alpha] in accordance with this Agreement, and (ii) the purchase and sale of, and payment for, such Products shall be made on the terms and conditions contained in this Agreement as if Metallic were the "seller" hereunder; provided that any claim by [Oracle] arising out of this Agreement shall be pursued against [Alpha] only. For the purposes of any such purchase and sale and without limiting the generality of the foregoing, (x) all such sales of Products shall count toward the Minimum Quantities, shall be sold to [Oracle] at the prices set forth herein and shall meet the quality, delivery and other requirements contained herein, and (y) [Alpha] shall be deemed to have made all representations, warranties, covenants, agreements and indemnities under this Agreement relating to any such sale of Products.

Doc. 190 at pp. 15-16, ¶ 30; Doc. 168-25 at 2.

Section 16 of the PSA concerns set-offs:

**SET-OFF**.  Without prejudice to any other right or remedy any Party (a "Wronged Party") may have, such Wronged Party hereby reserves the right to set off at any time any amount owing to it by the other Party (the "Breaching Party") under (a) the Transition Services Agreement, dated as of the date hereof, by and between [Oracle] and [Alpha], and (b) the Purchase Order, dated as of the date hereof, by and among [Oracle], [Alpha] and Metallic, against any amount payable hereunder by the Wronged Party to the Breaching Party; provided that the Wronged Party shall deliver written notice to the Breaching Party of the Wronged Party's intent to exercise such right and the Breaching Party shall have three (3) business days after delivery of any such notice to pay the amount owing to the Wrong[ed] Party prior to any set off.

Doc. 190 at pp. 21-22, ¶ 38; Doc. 168-25 at 6.  The PSA's choice-of-law provision states that the agreement is governed by North Carolina law.  Doc. 194 at ¶ 1; Doc. 168-25 at 10.

### B.    Disputes Among Oracle, Alpha, and Metallic

Oracle's performance under the PSA and TSA fell short from the outset.  Its aluminum orders from Alpha fell below the required quantities, Doc. 190 at pp. 25-26, ¶ 42, and Jack White did not provide full-time services to Alpha, *id.* at pp. 28-29, ¶ 46.

In March 2016, Metallic notified Oracle that Alpha had assigned to Metallic certain Oracle purchase orders.  *Id.* at pp. 30-31, ¶ 48.  Pursuant to the assignment, Metallic supplied aluminum to Oracle and issued invoices totaling $709,146.58.  *Id.* at pp. 30-32, ¶¶ 48, 50.  The record indisputably shows that Alpha assigned those purchase orders to Metallic.  Doc. 190 at pp. 30-31, ¶¶ 47-48.  It also indisputably shows that the PSA gave Alpha the right to assign purchase orders to Metallic; that Metallic informed Oracle that Alpha had done so; that Metallic provided aluminum to Oracle; and that Metallic issued invoices to Oracle for that aluminum.  *Id.* at pp. 13-14, ¶ 28, pp. 15-16, ¶ 30, pp. 30-32, ¶¶ 47-50.  Although LL Flex contests these matters, arguing that Alpha did not actually assign purchase orders to Metallic, Doc. 185 at 9-11; Doc. 190 at pp. 30-32, ¶¶ 47-49, the evidence it cites shows merely that the parties had some uncertainty about the process for facilitating invoices and handling billing and payment.  Doc. 186-1; Doc. 168-1 at 72-73 (285:17-287:19); Doc. 168-3 at 88-89 (346:19-352:8); Doc. 168-4 at

4

18 (66:16-67:17). LL Flex adduces no evidence casting doubt on the fact that Alpha indeed assigned purchase orders to Metallic pursuant to the PSA.

In 2016, Alpha obtained new financing from a firm called Accord Financial Corp. Doc. 190 at p. 33, ¶ 52. The financing agreement had two components: (1) Accord provided Alpha with a line of credit through a revolving note and secured by Alpha's assets, including its inventory; and (2) Alpha transferred its outstanding accounts receivable to Accord for approximately 85% of their face value. Doc. 190 at pp. 33-34, ¶ 53. Alpha then entered into an Intercreditor Agreement with Accord and Oracle, in which Alpha agreed to subordinate the obligations due from Alpha under the Oracle Note to the obligations due from Alpha to Accord. *Id*. at pp. 34-35, ¶ 54.

Oracle stopped making payments to Alpha and Metallic in May 2016. *Id*. at p. 35, ¶ 55. Ultimately, Oracle and LL Flex owed Alpha for unpaid invoices. *Id*. at pp. 39-40, ¶ 63. Accord stopped lending to Alpha, and Alpha ceased operations in July 2016. *Ibid*. Metallic likewise went out of business following Oracle's refusal to pay its invoices. *Id*. at pp. 40-41, ¶ 64.

On August 26, 2016, IBT—which had made a credit line available to Metallic secured by a first-priority lien on its business assets, including its accounts receivable, *id*. at p. 3, ¶ 5—sent Oracle and LL Flex a notice identifying itself as Metallic's secured creditor and demanding that they pay $855,799—$709,146.58 for the aluminum that Metallic shipped to Oracle, plus $146,651.95 for aluminum that Metallic shipped to LL Flex, *id*. at pp. 31-32, ¶ 49—due on the unpaid Metallic invoices. *Id*. at p. 43, ¶ 68; Doc. 168-68. On September 12, 2016, Oracle Controller Dave Robertson responded by email, stating that Oracle agreed with the invoice amounts but asserting that they would not be paid; the reason for the non-payment, which Robertson had expressed to IBT previously, concerned Oracle's and LL Flex's "legal dispute"

with Alpha.  Doc. 190 at pp. 43-44, ¶ 69; Doc. 168-71 (Robertson stating that "we are now in agreement with the balance shown on our books and your detail," but that "[t]he payment of these will be addressed separately").  The parties identify no record evidence suggesting that Oracle or LL Flex objected to IBT's payment demand on grounds other than the legal dispute with Alpha.

In January 2017, IBT sent letters to Oracle and LL Flex reiterating its understanding of the amount owed on the unpaid Metallic invoices and again demanding payment.  Doc. 190 at pp. 43-44, ¶ 69; Docs. 168-74, 168-75.  Shortly thereafter, IBT filed this suit against Oracle seeking $709,146.58, Doc. 1, and a parallel suit against LL Flex in Illinois state court seeking $146,651.95, Doc. 190 at p. 44, ¶ 70.  In late June, after Oracle merged into LL Flex, Doc. 190 at p. 1, ¶ 2, LL Flex substituted for Oracle as the party defendant in this case, Doc. 82, resulting in it being the defendant in both suits.

On August 13, 2019, the Illinois state court entered final judgment in LL Flex's favor. Doc. 204-2; Doc. 204-4.  Having previously dismissed IBT's breach of contract claim, the state court granted LL Flex summary judgment on IBT's account stated claim, holding that LL Flex's refusals to pay the amounts requested by IBT defeated the claim as a matter of law.  Doc. 204-2 at 41-42.  IBT did not appeal, and the time to appeal has elapsed.  Doc. 204 at 2.

### D.     The Accord Litigation

In the meantime, following Alpha's closure, Accord sued Oracle and LL Flex in North Carolina state court to recover on unpaid Alpha invoices, and Oracle filed a separate lawsuit in North Carolina state court against Alpha—in which Accord later intervened as a party defendant—for alleged breaches of the PSA, TSA, and Sublease.  Doc. 190 at pp. 41-42, ¶¶ 65-66.  In the suit brought by Accord, Oracle asserted an affirmative defense claiming the right to

set off the amounts that Alpha owed Oracle under the PSA, TSA, and Sublease.  *Id*. at p. 41,

¶ 65.

Accord, Oracle, and LL Flex eventually settled.  Doc. 190 at pp. 44-45, ¶ 71.  The

settlement agreement released:

> any and all claims, damages, causes of action, suits, or costs, of whatever
> nature, character or description, whether known or unknown, suspected or
> unsuspected, anticipated or unanticipated, which they may have or may
> hereafter have or claim to have, individually or collectively, in any way
> arising out of or related to the issues raised in the [Accord/Oracle and
> Oracle/Alpha] Lawsuit[s], including, but not limited to, any and all claims that
> were or could have been alleged by either one of them.  The parties represent
> and warrant that they have not sold, assigned, transferred, hypothecated,
> pledged, encumbered, or disposed of, in whole or in part, voluntarily or
> involuntarily, any claims, damages, causes of action, suits, or costs that are
> released by this paragraph.  It is the Parties' intention that this Agreement
> shall be effective as a full and final accord and release, even though they,
> individually or collectively, may at some point in the future discover facts in
> addition to or different from those which they now know or believe to be true.

Doc. 169-3 at 4; Doc. 190 at pp. 44-45, ¶ 71.  The release extended to their claims against "one

another, their respective attorneys, insurers, assignees, transferors, transferees, principals,

partners, officers, members, managers, employees, servants, subsidiaries, parent corporations,

affiliates, successors, investors, stockholders, agents, and representatives."  Doc. 169-3 at 4.

### Discussion

IBT brings breach of contract and account stated claims against LL Flex, both seeking

payment from LL Flex of the amounts owed by Oracle under the PSA.  Doc. 102 at ¶¶ 38-54.

LL Flex asserts a set-off affirmative defense, alleging that Alpha breached the PSA, TSA,

Sublease, and Oracle Note, that Alpha owes LL Flex amounts exceeding any liability LL Flex

might have to IBT, and that LL Flex may set off those amounts against Alpha's assignee,

Metallic, and, by extension, against IBT as Metallic's assignee and secured creditor.  Doc. 104 at

pp. 16-18.  LL Flex moves for summary judgment on its set-off defense and against IBT's

account stated claim, Doc. 144, and IBT moves for summary judgment on both of its claims and on LL Flex's defense, Doc. 165.

I.     **IBT's Claims**

A.     **Account Stated Claim**

While the PSA—and thus the breach of contract claim—is governed by North Carolina law, Doc. 194 at ¶ 1, neither party addresses which State's law governs the account stated claim, so Illinois law applies. *See Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 345 (7th Cir. 2010) (holding that if "[n]o party raises a choice of law issue," the court "appl[ies] the law of the forum state"). "An 'account stated' determines the amount of a preexisting debt when parties who previously have conducted monetary transactions agree that there truly is an account representing the transactions between them." *Delta Consulting Grp., Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009). Where a buyer fails to object within a reasonable time to an account invoice sent by a seller, an account stated is established. *See id.* at 1137-38.

IBT alleges that an account stated was formed when Robertson, on Oracle's behalf, sent his September 12, 2016 email agreeing with IBT's August 26, 2016 notice stating that Oracle had not paid $709,146.58 due on the Metallic invoices. Doc. 102 at ¶¶ 38-48. LL Flex maintains that the claim is precluded by the Illinois state court's judgment against IBT in its suit against LL Flex. Doc. 206. As noted, the state court granted summary judgment to LL Flex on IBT's account state claim. In so doing, the court reasoned that LL Flex's refusal—set forth in Robertson's September 12, 2016 email—to pay the Metallic invoices due to outstanding legal issues concerning Alpha foreclosed the account stated claim under Illinois law:

> In … the Patrick Engineering case, … the Illinois Supreme Court made clear
> that an account stated requires both an agreement that the account is accurate

and a promise expressed or implied for payment; further, the Court noted that there must be meeting of the minds in this regard.

Under the facts presented here, particularly Robertson's September 12th e-mail and Lempa's e-mail of September 13th show unequivocally that [LL Flex] refused to pay because of outstanding legal issues between Oracle and Alpha and under Patrick there is no account stated.

I would just note that I think counsel for LL Flex stated it well when he said there can be no implied promise when there's an expressed refusal to pay, and I think that's accurate.

On that basis I'm going to grant LL Flex's motion for summary judgment.

Doc. 204-2 at 41-42.

The collateral estoppel doctrine, or "issue preclusion," prohibits a party under certain circumstances from re-litigating an issue that another court previously decided against it. To determine whether collateral estoppel applies, a federal court "look[s] to the preclusion law of the state where the judgment was rendered." *Adams v. Adams*, 738 F.3d 861, 865 (7th Cir. 2013); *see also Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005) ("28 U.S.C. § 1738 … requires the federal court to give the same preclusive effect to a state-court judgment as another court of that State would give.") (internal quotation marks omitted). In Illinois, a court decision adverse to a party on a particular issue in one suit precludes that party from contesting the same issue in another suit only if "(1) the issue decided in the prior adjudication is identical with the one presented in the suit in question, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication." *Nowak v. St. Rita High Sch.*, 757 N.E.2d 471, 478 (Ill. 2001); *see also Brokaw v. Weaver*, 305 F.3d 660, 669 (7th Cir. 2002) (same).

The second and third requirements are plainly satisfied here, as the state court's decision is a final judgment on the merits—IBT did not appeal the judgment, *see Doctor's Assocs., Inc. v.*

*Distajo*, 66 F.3d 438, 449 (7th Cir. 1995) ("The Illinois Supreme Court has held that an Illinois judgment is not final, and thus not entitled to preclusive effect, until the time for appeal has expired.")—and IBT is a party in both this suit and the state court suit.  As to the first requirement, LL Flex correctly argues that because the state court conclusively determined that Robertson's refusal to pay Metallic's LL Flex invoices defeated an essential predicate of IBT's account stated claim there, Robertson's simultaneous refusal to pay Metallic's Oracle invoices does the same thing here.  Doc. 206 at 4.  Although this case concerns the Oracle invoices and the state court case concerned the LL Flex invoices, Robertson's refusal to pay the two sets of invoices were expressed not only simultaneously, but in the same sentence; in fact, Robertson did not separately reference the two sets of invoices when he refused to pay.  IBT therefore is precluded from relitigating here the issue whether Robertson's email created an account stated, which in turn defeats its account stated claim as a matter of law.  *See Swanson v. Baker & McKenzie, LLP*, 2016 WL 7231610, at *3 (N.D. Ill. Dec. 14, 2016) (holding that minor differences between the prior and present lawsuits did not defeat collateral estoppel where the "changed circumstances [were] not material, and therefore [did] not amount to controlling facts"); *Ill. Bell Tel. Co. v. Haines & Co., Inc.*, 713 F. Supp. 1122, 1124 (N.D. Ill. 1989) ("That some minor, subsidiary facts are different will not bar the application of collateral estoppel.").

IBT argues that even if all three requirements of issue preclusion are satisfied, LL Flex's failure to object to IBT's pursuit of concurrent lawsuits waived its issue preclusion defense.  Doc. 207 at 5-6.  In support, IBT cites a single, nonprecedential decision, *Stulberg v. Intermedics Orthopedics, Inc.*, 997 F. Supp. 1060 (N.D. Ill. 1998).  *See Matheny v. United States*, 469 F.3d 1093, 1097 (7th Cir. 2006) ("[D]istrict court opinions do not have precedential authority.").  True enough, *Stulberg* holds that "by failing to timely object to separate actions, a defendant is

deemed to acquiesce in the plaintiff's simultaneous suits and waives any res judicata or collateral

estoppel defense." *Stulberg*, 997 F. Supp. at 1065. But the defendants in *Stulberg* did far more

than simply proceed with two separate suits; rather, "they willingly accepted the burden of

defending both actions simultaneously" by "oppos[ing] the [plaintiffs'] attempt to halt th[e]

court's proceedings pending the outcome of arbitration." *Ibid*. Here, by contrast, IBT does not

explain when or how LL Flex could have objected to simultaneous litigation—recall that LL

Flex was substituted for Oracle as party defendant in this suit only in late June 2018, nearly

eighteen months after this suit was brought—let alone identify any way in which IBT "willingly

accepted the burden of defending both actions simultaneously" in a manner comparable to what

the *Stulberg* defendants did. *Ibid*. Accordingly, even if *Stulberg* is good law, IBT fails to

demonstrate that LL Flex waived its issue preclusion defense to the account stated claim.

### B. Breach of Contract Claim

IBT's breach of contract claim—which the state court judgment does not preclude—

alleges that LL Flex is liable for Oracle's breach of the PSA by refusing to pay the Metallic

invoices. Doc. 102 at ¶¶ 49-54. In arguing that Oracle did not breach, LL Flex maintains that

Alpha did not validly assign accounts to Metallic under the PSA. Doc. 185 at 9-11. Because

that argument fails, IBT is entitled to summary judgment as to liability on the contract claim.

The PSA allowed Alpha to assign Oracle's aluminum purchase orders to Metallic under

certain circumstances. Doc. 190 at pp. 13-14, ¶ 28. In March 2016, having informed Oracle that

Alpha had made such assignments, Metallic issued invoices to Oracle. *Id*. at pp. 30-31, ¶ 48.

Oracle paid Metallic for aluminum shipments through May 2016, without questioning whether

payment was due under the PSA, *id*. at p. 35, ¶ 55; Oracle's own books indicated amounts owed

to Metallic for delivered product, *id*. at pp. 38-39, ¶¶ 60-62; and Alpha's accountant emailed

Alpha's equipment lender confirming the arrangement with Metallic, Doc. 194 at ¶ 11. The undisputed facts thus demonstrate that Oracle had an agreement to purchase aluminum from Metallic pursuant to assignments from Alpha; that Oracle knew Alpha had assigned orders to Metallic; that Oracle received invoices for orders from Metallic; and that after Oracle stopped paying invoices and contested the amounts owed, it did so only on the basis of claimed set-offs and not on the ground that the charges were somehow invalid under the PSA. No reasonable jury could find that the aluminum deliveries here did not arise from purchase orders assigned to Metallic by Alpha pursuant to the PSA.

To support its submission that "Alpha and Metallic did not understand or agree about what rights Alpha was assigning to Metallic or what rights either side had in payments from Oracle," Doc. 194 at ¶ 13, LL Flex cites an email chain between the presidents of Alpha and Metallic disputing some particulars of their relationship, Doc. 186-2. LL Flex does not identify, and the court cannot discern, anything in those emails raising a question as to whether Metallic was actually assigned aluminum orders from Alpha or had the legal right to recover amounts owed from Oracle. There accordingly is no legitimate dispute that Oracle had an obligation under the PSA to pay Metallic for the aluminum and that it breached that obligation.

## II.     LL Flex's Affirmative Defense

Although IBT is entitled to summary judgment as to liability on its breach of contract claim, it must not only prove its damages, but also overcome LL Flex's affirmative defense. LL Flex's defense alleges that Alpha's breaches of the TSA, PSA, Sublease, and Oracle Note provide LL Flex with set-off rights exceeding any amount it owes IBT for Oracle's breach of the PSA. Doc. 104 at pp. 16-18; Doc. 145 at 6-9; Doc. 185 at 15-30.

Section 9-404 of the Uniform Commercial Code, which North Carolina has adopted, provides that "[u]nless an account debtor has made an enforceable agreement not to assert

defenses or claims, … the rights of an assignee are subject to … (1) … any defense or claim in recoupment arising from the transaction that gave rise to the contract [and] (2) [a]ny other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment." N.C. Gen. Stat. § 25-9-404(a)(1)-(2); *see also* 810 ILCS 5/9-404(a)(1)-(2). Recoupment defenses are encompassed by § 9-404(a)(1), while set-off defenses fall under § 9-404(a)(2). *Compare Recoupment*, Black's Law Dictionary (11th ed. 2019) ("Reduction of a plaintiff's damages because of a demand by the defendant arising out of the same transaction."), *with Setoff*, Black's Law Dictionary (11th ed. 2019) ("A defendant's counterdemand against the plaintiff, arising out of a transaction independent of the plaintiff's claim."). Section 9-404 further specifies, as to both recoupment and set-off, that "the claim of an account debtor against an assignor may be asserted against an assignee … only to reduce the amount the account debtor owes." N.C. Gen. Stat. § 25-9-404(b); *see also* 810 ILCS 5/9-404(b). LL Flex's affirmative defense alleges that § 9-404 entitles LL Flex (the account debtor) to set off the money that Alpha (the assignor) owes LL Flex against the sums that LL Flex owes to Metallic (Alpha's assignee) and thus to IBT (Metallic's assignee).

In denying IBT's Rule 12(c) motion for judgment on LL Flex's defense, this court held that IBT had not shown that the PSA waived or otherwise limited the defense. Specifically, the court rejected IBT's argument that Section 16 of the PSA worked an implied wavier of Oracle's set-off rights, finding nothing in the contract sufficient to overcome significant textual evidence to the contrary. 2018 WL 1508488, at *2-3. The court also rejected IBT's argument that Oracle's defense was barred by Section 2(b) of the PSA, which limited Oracle and LL Flex's ability to pursue *claims* against entities other than Alpha, as Oracle pursued its set-off rights only as a *defense*, not a claim. *Id*. at *4.

IBT argues that § 9-404(a)(2)'s accrual requirement for set-off bars LL Flex's affirmative defense. IBT observes that set-off under § 9-404(a)(2), unlike recoupment under § 9-404(a)(1), must "accrue before the account debtor receives a notification of the assignment." Doc. 166 at 13-14. This is significant, IBT contends, because LL Flex's defense accrued after June 2016, while Oracle became aware of the assignment to Metallic of the relevant purchase orders in early March 2016 at the latest. *Ibid.* The trouble with this argument is that IBT itself acknowledges that LL Flex's defense may be understood as sounding not only in set-off under § 9-404(a)(2), but also in recoupment under § 9-404(a)(1). *Id.* at 14-15. While otherwise similar to set-off, recoupment arises where a defendant seeks to offset obligations arising from the same transaction that gave rise to the plaintiff's claim. *See In re Eye Ctr.-Pending Matters*, 2016 WL 4163928, at *7 (N.C. Super. Ct. July 22, 2016) ("Although all of Dr. Matthews' Amended Counterclaims are denominated as claims for set-off, the Court concludes that his counterclaims for breach of the Employment Agreement and violation of the Wage and Hour Act are in the nature of recoupment because they arise from the same transaction as CCSEA's claims … ."). And as LL Flex argues and IBT does not contest, Alpha's alleged breaches concern contracts that arose out of the broader series of transactions that gave rise to the PSA, the basis of IBT's breach of contract claim. Doc. 185 at 18. The court will therefore construe LL Flex's defense as also sounding in recoupment, which allows it to proceed under § 9-404(a)(1) and thereby avoid § 9-404(a)(2)'s accrual requirement.

IBT next argues that Section 2(b) of the PSA waives Oracle's (and thus LL Flex's) right to assert any set-off/recoupment defense as to amounts owed on purchase orders assigned to Metallic. Doc. 166 at 18-20; Doc. 180 at 6-8. The court considered and rejected that argument in its Rule 12(c) opinion, explaining: "[A]s IBT itself recognizes, Doc. 65 at 11, Oracle raises

set-off as a *defense*, not as a *claim*.  It follows that section 2(b), which limits Metallic's exposure

to affirmative *claims* by Oracle, does not speak to section 16's impact on Oracle's *defense*."

2018 WL 1508488, at *4.  Seeking a different result this time, IBT contends that (1) a set-off or

recoupment defense relies on the possibility of a valid underlying claim and (2) certain cases

construe set-off and recoupment defenses as counterclaims.  Doc. 166 at 18-19.  The cases cited

by IBT do not support the first argument, nor would that argument—even if accurate—overcome

the simple fact that LL Flex is not pressing a set-off *claim* here.  And while certain decisions

might deem LL Flex's affirmative defense to be a counterclaim under Illinois law, *see MCK*

*Millenium Centre Parking, LLC v. Central Parking Sys., Inc.*, 2012 WL 1932616, at *8 n.9 (N.D.

Ill. May 29, 2012) ("Arguably, a claim for setoff under Illinois law should be pleaded as a

counterclaim, not an affirmative defense."), the PSA is governed by North Carolina law, which

does not follow the same approach.  *See Settlers Edge Holding Co., LLC v. RES-NC Settlers*

*Edge, LLC*, 793 S.E.2d 722, 731-32 (N.C. App. 2016) (allowing a recoupment affirmative

defense to proceed at summary judgment without requiring that it be treated as a claim); *In re*

*Eye Ctr.-Pending Matters*, 2016 WL 4163928, at *7 (observing that "a claim for set-off" can be

"asserted as an affirmative defense or counterclaim").  North Carolina law is the appropriate

guide here, as the court's task is to determine what the parties meant by the term "claims" in

Section 2(b) of the PSA, and it is the law governing that agreement that sheds the most light on

the parties' intentions.

 IBT next contends that Section 16 of the PSA imposes specific requirements regarding

set-off and recoupment under the PSA, and that LL Flex and Oracle failed to meet those

requirements and therefore waived whatever independent rights they might have had under § 9-

404.  Doc. 166 at 21-25; Doc. 180 at 8-11.  Once again, the court considered and rejected that

argument in its Rule 12(c) opinion.  As the court explained, IBT's argument faces a "formidable obstacle" in Section 16's qualification that it is "[w]ithout prejudice to any other right or remedy any Party … may have," and "[t]he trouble with IBT's contention … is that the phrase 'any other right or remedy' may plausibly be read to mean *any* right or remedy—including any set-off remedies—other than the particular set-off remedy specified in section 16."  2018 WL 1508488, at *3 (emphasis and first and second alterations in original); *see also Smith v. State Farm Fire & Cas. Co.*, 426 S.E.2d 457, 459-60 (N.C. App. 1993) (holding as a matter of contract interpretation that "any means any") (internal quotation marks omitted).  The extrinsic evidence cited by IBT, Doc. 190 at pp. 17-22, ¶¶ 33-38, is of no moment because Section 16 is not ambiguous on this point.  *See SAS Inst., Inc. v. World Programming Ltd.*, 874 F.3d 370, 382 (4th Cir. 2017) ("North Carolina contract law turns to extrinsic evidence only after the contract is found to be ambiguous.  Where, as here, the contractual terms are unambiguous, the analysis comes to an end … .") (citations omitted).  And IBT's argument that this reading of Section 16 "creates an absurd result" because it renders the provision's notice language superfluous and treats set-off/recoupment rights under the TSA and Purchase Orders differently than those under the Sublease and Oracle Note, Doc. 166 at 23, fails both because it is not absurd for different contracts to create distinct rights and obligations and for the reasons set forth in the court's prior opinion.  2018 WL 1508488, at *3 ("As it happens, section 16 does add something of its own— the provision can be understood as a 'netting provision' that creates a procedure under which the parties could privately net offsetting obligations so as to avoid the hassle of making redundant payments.") (internal quotation marks omitted).

IBT fares better with its argument that Oracle, by entering into the settlement agreement in the Accord litigation, released any claimed set-off/recoupment against Alpha as to amounts

owed under the TSA, PSA, and Sublease.  Doc. 166 at 31-33; Doc. 180 at 14-15.  The release, quoted in full above, is expansive, providing in relevant part that the parties released "any and all claims, damages, causes of action, suits, or costs, of whatever nature, character of description … which they may have or may hereafter have or claim to have, individually or collectively, in any way arising out of or related to the issues raised in the [Accord] Lawsuit[s], including, but not limited to, any and all claims that were or could have been alleged by either one of them," Doc. 190 at pp. 44-45, ¶ 71, including claims against "one another, their respective attorneys, insurers, assignees, transferors, transferees, principals, partners, officers, members, managers, employees, servants, subsidiaries, parent corporations, affiliates, successors, investors, stockholders, agents, and representatives," Doc. 169-3 at 4; Doc. 190 at pp. 44-45, ¶ 71.  Because LL Flex's set-off/recoupment defense turns in part on amounts allegedly owed by Alpha under the TSA, PSA, and Sublease, those portions of the defense are "in any way … related to the issues raised" in the Accord lawsuits and thus are covered by the release.  *See Weaver v. Saint Joseph of the Pines, Inc.*, 652 S.E.2d 701, 709-10 (N.C. App. 2007) ("It is immaterial that neither the Release nor the Mediation Settlement Agreement specifically mentions the claim at issue in this case or that the possible existence of this claim never arose during the mediation.  As our Supreme Court has held: '"[t]he language in a release may be broad enough to cover all demands or rights to demand, or possible causes of action, a complete discharge of liability from one to another, whether or not the various demands or claims have been discussed or mentioned, and whether or not the possible claims are all known."'") (quoting *Merrimon v. Postal Telegraph-Cable Co.*, 176 S.E. 246, 248 (N.C. 1934)).  It follows that IBT is entitled to partial summary judgment on LL Flex's affirmative defense insofar as it seeks a set-off/recoupment for amounts owed by Alpha to Oracle under the TSA, PSA, and Sublease.

Attempting to avoid this result, LL Flex contends that it is not a "transferor" within the meaning of the release because that term refers, at least in context, only to "a transfer on an entity level." Doc. 185 at 30. That reading of "transferor" would render the term superfluous. Any "transferee" would have received the business's assets from either one of the parties to the release (Accord, Oracle, and LL Flex) or from one of their past transferees—all of whom are covered by other language in the release. Doc. 169-3 at 4 ("[T]he Parties … do hereby release and forever discharge one another[ and] their respective … transferees … from any and all claims, damages, causes of action, suits, or costs, of whatever nature, character or description … which they may have or may hereafter have or claim to have … in any way arising out of or related to the issues raised in the Lawsuit."). And LL Flex points to no evidence indicating that any party to the settlement had itself received "a transfer of substantially all the assets of a business." Doc. 185 at 30. Accordingly, to avoid being entirely superfluous, the term "transferor" must encompass more than transfers on an entity level. *See Rota-McLarty v. Santander Consumer USA, Inc.*, 700 F.3d 690, 701 (4th Cir. 2012) ("Basic principles of contract interpretation instruct us to look first to the plain meaning of the contract's terms, and also to give meaning to each word used and avoid constructions that render language meaningless, superfluous, or contradictory."). Here, the term "transferor" encompasses, at the very least, the entity—Alpha—that transferred to Accord the very claims the settlement agreement resolved and released; if "transferor" is to mean anything, it must refer to the direct transferor of the claims the parties sought to resolve by their agreement. And because LL Flex's set-off/recoupment defense is derivative of its claims against Alpha and Metallic, it has accordingly already released any such defense arising under the TSA, PSA, or Sublease.

As IBT acknowledges, Doc. 193 at 11, that leaves LL Flex's defense as it pertains to amounts that Alpha owes Oracle under the Oracle Note. IBT maintains that this portion of the defense cannot proceed because Oracle previously committed material breaches of the MUPA, TSA, and PSA by providing incorrect inventory and working capital estimates prior to the MUPA, by improperly withholding Jack White's services, by failing to purchase promised minimum quantities of aluminum from Alpha, and by unjustifiably stopping payment on invoices under the PSA. Doc. 166 at 26-31. LL Flex responds that because Alpha "continu[ed] to perform under the various contracts after Oracle's purported breaches, Alpha (and by extension Metallic and IBT) waived the right to repudiate its own obligations." Doc. 185 at 24. But IBT's argument is not that it was excused from its own contractual obligations; rather, it is that whatever IBT's contractual obligations might have been, LL Flex still may not benefit from the harm it (or Oracle) caused to Alpha. In IBT's telling, Oracle's breaches caused Alpha's failure and thus Oracle's own damages, which is significant because North Carolina law does not allow a party "to be enriched to the injury and cost of another, which was induced by [its] own acts." Doc. 166 at 26 (quoting *Perry v. Norton*, 109 S.E. 641, 642 (N.C. Super. Ct. 1921)).

The question whether Oracle's breaches were responsible for Alpha's failure cannot be answered at this juncture given the many genuine factual disputes presented by the summary judgment record. Did Oracle misstate its capital estimates prior to the MUPA, and were any misstatements material? Would an infusion of additional cash in December 2015 have salvaged Alpha's business? Would more robust services from White have secured sales adequate to continue Alpha's operations? Would additional orders in late 2015 have kept Alpha afloat? Particularly in the absence of evidence substantiating and elaborating on Alpha's financial condition at the relevant times, those questions are not amenable to resolution on summary

judgment. *Cf. Sahadi v. Cont'l Ill. Nat'l Bank & Tr. Co. of Chi.*, 706 F.2d 193, 196-97 (7th Cir. 1983) ("[T]he determination of 'materiality' is a complicated question of fact … especially unsuited to resolution by summary judgment."). In its reply brief, IBT's answer to LL Flex's cataloging of these unresolved issues is to assert, without further elaboration, that the combined effect of Oracle's breaches—rather than any single breach—indisputably caused Alpha's collapse. Doc. 193 at 10. But when construing the facts in the light most favorable to LL Flex— as the court must at this juncture—that response is not enough to justify summary judgment for IBT against LL Flex's affirmative defense as to its set-off rights under the Oracle Note.

To support its own bid for summary judgment on the Oracle Note component of its affirmative defense, LL Flex argues that its alleged breaches of the MUPA, TSA, and PSA are irrelevant because they do not pertain to the Oracle Note. Doc. 185 at 22-23; Doc. 192 at 4. Relatedly, LL Flex adds that "IBT cannot rely on Oracle's alleged breach of the MUPA as a basis to avoid setoff for the simple reason that Alpha was not a party to the MUPA." Doc. 185 at 23-24. But LL Flex itself characterized the array of agreements as interconnected components of a single transaction in a successful effort to avoid § 9-404(a)(2)'s accrual requirement for set-off defenses, Doc. 145 at 7; Doc. 185 at 15-16, and it cannot now be heard to suggest that the agreements should, on second thought, be treated as isolated and separate. *See In re Hovis*, 356 F.3d 820, 823 (7th Cir. 2004) ("One who argues a position in court, and prevails, rarely is entitled to switch ground and argue an inconsistent position later, even within the scope of a single proceeding.").

### Conclusion

IBT's summary judgment motion is granted as to liability on its breach of contract claim and as to LL Flex's affirmative defense insofar as it seeks to set off or recoup from IBT the

amounts Alpha allegedly owes under the TSA, PSA, and Sublease.  IBT's motion is denied as to

its account stated claim and as to LL Flex's affirmative defense insofar as it seeks to set off or

recoup the amounts Alpha allegedly owes under the Oracle Note.  LL Flex's summary judgment

motion is granted as to IBT's account stated claim and otherwise is denied.  This case will

proceed to trial as to (1) damages on IBT's breach of contract claim and (2) the Oracle Note

component of LL Flex's affirmative defense.

March 19, 2020

_____
                United States District Judge